IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DAWN BERRUECOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No.  14-1223-JAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of the final decision of Defendant Commissioner of Social Security denying Plaintiff Dawn Berruecos' application for a period of disability and disability benefits under Title II of the Social Security Act,[1] as well as supplemental security income, under Title XVI of the Social Security Act.[2]  Because the Court finds that Defendant's findings are supported by substantial evidence, the Court affirms Defendant's decision.

**I.    Procedural History**

On February 8, 2010, Plaintiff protectively applied for a period of disability and disability insurance benefits and supplemental security income.  Her applications claimed an onset date of November 23, 2008; and she was last insured for disability insurance benefits on December 31, 2013.  Plaintiff's applications were denied initially and upon reconsideration.

---

[1]42 U.S.C. §§ 401–434.

[2]42 U.S.C. §§ 1381 *et seq.*

Plaintiff timely requested a hearing before an administrative law judge ("ALJ"). After a hearing, the ALJ issued a decision finding that Plaintiff was not disabled; the Appeals Council denied plaintiff's request for review of the ALJ's decision. Plaintiff then timely sought judicial review before this Court.

## II.     Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether Defendant's decision is supported by substantial evidence in the record as a whole and whether Defendant applied the correct legal standards.[3] The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of Defendant.[5]

## III.    Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[6] An individual "shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any

---

[3] *See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)).

[4] *Id.* (quoting *Castellano*, 26 F.3d at 1028).

[5] *Id.*

[6] 42 U.S.C. §§ 423(d)(1)(A), 416(i), 1382c(a)(3)(A).

other kind of substantial gainful work which exists in the national economy."[7] The Secretary has established a five-step sequential evaluation process to determine whether a claimant is disabled.[8] If the ALJ determines the claimant is disabled or not disabled at any step, the evaluation ends.[9]

Plaintiff does not challenge the ALJ's determination at step one that Plaintiff has not engaged in substantial gainful activity[10] since November 23, 2008, the alleged onset date. Nor does Plaintiff challenge the ALJ's determination at step two that Plaintiff has medically "severe" impairments: obesity, sleep apnea, degenerative disc disease of the cervical spine, major depressive disorder, borderline intellectual functioning and personality disorder not otherwise specified.

But Plaintiff challenges the ALJ's determination at step three that her severe impairment of sleep apnea does not meet Listing 3.10, and challenges the ALJ's failure to consider Listing 12.02 as part of that process. Plaintiff argues that this error had consequential effects, for sleep apnea can further impair cognitive functioning and Plaintiff also has a severe impairment of borderline intellectual functioning.

Plaintiff also challenges the ALJ's determination of RFC at steps four and five that Plaintiff "retains the ability to understand and remember simple instructions, maintain concentration, persistence and pace to complete simple tasks in a work environment that limits

---

[7]*Id.* at §§ 423(d)(2)(A), 1382c(a)(3)(B).

[8]*Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1983).

[9]*Id.*

[10]*See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

contact with the general public, coworkers and supervisors to occasional and can adapt to changes in a work environment with the above limitations." Plaintiff argues this mental RFC determination was the product of the ALJ's erroneous determination at step 3, as well as the ALJ's selective consideration of the evidence and the ALJ's erroneous rejection of treating-source opinions from Dr. Marek and APRN Koehn.

**IV.   Discussion**

    **A.   Sleep Apnea not meeting or equaling listing; APRN Koehn's opinion**

Plaintiff contends that the ALJ erred in finding that her sleep apnea did not meet or equal Listing 3.10 (sleep-related breathing disorders).[11] The ALJ found that sleep apnea should be evaluated under Listing 3.09 (chronic cor pulmonale)[12] or Listing 12.02 (organic mental disorders),[13] but determined that since "there are no indications in the medical record of a mental cause of the apnea the evaluation is best conducted under listing 3.09", rather than 12.02. The ALJ then found that Plaintiff's impairment did not meet Listing 3.09 because she does not have a mean pulmonary artery pressure greater than 40mm HG or arterial hypoxemia.

Plaintiff concedes that Listing 3.09 does not apply. But Plaintiff argues that the ALJ erred in finding that Listing 12.02 does not apply because there are no indications that a mental condition caused the sleep apnea. Plaintiff argues that sleep apnea is not caused by a mental condition, as the ALJ found; rather sleep apnea causes oxygen deprivation, which in turn often causes cognitive decline and mental impairment.

---

[11]20 C.F.R. pt. 404, subpt. P, app. 1, § 3.10.

[12]*Id.* at § 3.09.

[13]*Id.* at § 12.02.

To be sure, the ALJ erred in not evaluating Plaintiff under both Listing 3.09 and Listing 12.02. But, the ALJ did evaluate Plaintiff's mental impairments under Listings 12.04 and 12.08.[14] To meet Listing 12.08, a claimant must show that she meets the requirements of both "paragraph A" and "paragraph B" criteria.[15] To meet Listings 12.02 or 12.04, a claimant must show that she meets the requirements of "paragraph C" criteria;[16] or, alternatively, a claimant must show that she meets the requirements of both "paragraph A" and "paragraph B" criteria.[17]

Here, Plaintiff does not challenge the ALJ's determination that she did not meet the "paragraph C" criteria for Listings 12.02 and 12.04.[18] But Plaintiff contends the ALJ erred in not evaluating her under the "paragraph A" and "paragraph B" criteria of Listing 12.02. Yet these criteria are identical to the "paragraph A" and "paragraph B" criteria of Listings 12.04 and 12.08, which the ALJ did evaluate. Thus, to the extent the ALJ properly found that Plaintiff had not met both the "paragraph A" and "paragraph B" criteria of Listings 12.04 and 12.08, any error in not evaluating Plaintiff under those same identical criteria of Listing 12.02 was harmless error.[19]

Here, the ALJ focused on the "paragraph B" criteria of Listings 12.04 and 12.08, which are identical to the "paragraph B" criteria of Listing 12.02.[20] Those criteria require that the

---

[14]*Id.* at §§ 12.04, 12.08.

[15]*Id.* at §§ 12.08(A) and (B).

[16]*Id.* at §§ 12.02(C), 12.04(C).

[17]*Id.* at §§ 12.02(A) and (B), 12.04(A) and (B).

[18]Tr. 75.

[19]*See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-734 (10th Cir.2005) (at step three, harmless error analysis may be appropriate to supply a missing dispositive finding, where based on the material the ALJ considered, albeit improperly, the reviewing court can "confidently say that no reasonable administrative factfinder, following the correct analysis could have resolved the factual matter in any other way.").

[20]*See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.02(B), 12.04(B), 12.08(B).

claimant show that her impairment resulted in a functional impairment in at least two of four domains: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation each of extended duration.[21]

Plaintiff argues that the ALJ erred in finding that she had shown no episodes of decompensation. But the ALJ actually found that she had "experienced no episodes of decompensation, which have been of extended duration."[22] To meet this domain of the paragraph B criteria, a claimant must show that she "experienced repeated episodes of decompensation each of an extended duration."[23] An episode of decompensation is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace."[24] Episodes of decompensation can be demonstrated by showing "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)."[25] Furthermore, the episodes must be repeated and of extended duration, which "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks,"[26] although more frequent episodes of shorter duration or less frequent episodes of longer

---

[21] *Id.*

[22] Tr. 75.

[23] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02(B)(4).

[24] *Id.* at § 12.00(C)(4).

[25] *Id.*

[26] *Id.*

6

duration might qualify "if the duration and functional effects of the episodes are of equal severity . . . ."[27]

Here, the record demonstrates, and the ALJ found, that in August 2009, Plaintiff was hospitalized for overdosing on Flexeril, in a failed suicide attempt. While this was undoubtedly an episode of decompensation, it was short-lived. Plaintiff was hospitalized for only two days, and her GAF score rose from 31-40 upon admission, to 60-70 upon discharge.

Furthermore, other than this short episode of decompensation, Plaintiff shows no other episodes of decompensation and certainly no episodes of extended duration. Plaintiff relies on treatment notes in 2012, and in particular an August 3, 2012 medication management note by APRN (nurse practitioner) Karen Koehn, that characterized Plaintiff's prognosis as "[g]uarded due to client experiencing numerous chronic physical conditions, client's living situation, psychotropics causing adverse effects, personality disorder, and poor insight." But that August 3, 2012 note discussed Plaintiff's situation over the past year and revealed that, while Plaintiff had ongoing problems with depression, anxiety, and marital problems, there was no exacerbation. In fact, in this August 3 note, APRN Koehn recommended that both Cymbalta and Depakote be discontinued, at Plaintiff's request, and that Plaintiff start taking Lamictal to help with mood stabilization, depression, anxiety, and agitation. Neither in this note, nor in the historical recap in this note, is there evidence of any exacerbation of symptoms indicative of an episode of decompensation.

Plaintiff also relies on a September 12, 2013 medication management note by APRN Tobe Schneider, where Plaintiff reported "much worse anxiety to the point she does not want to

---

[27]*Id.*

leave her home." But APRN Schneider noted that there as "[n]o acute impairment noted with mental status and/or memory at time of exam/testing" on September 7, 2013. Nothing in Schneider's note indicates that Plaintiff was suffering an exacerbation of symptoms accompanied by a loss of adaptive functioning, as manifested by worsening abilities to perform activities of daily living, maintain social relationships, or maintain concentration, persistence or pace." Indeed, this September 12 note was consistent with many treatment and medication notes in 2011 and 2012 which noted that while Plaintiff had poor insight and judgment, and impaired memory, attention and concentration, her cognitive functioning remained at her baseline. And, none of these same treatment notes indicated any loss of adaptive functioning.

Moreover, even if this September 12, 2013 note evidences an episode of decompensation—in the sense that Plaintiff's GAF was 50,[28] when throughout 2011 and 2012 her GAF ranged from 53 to 57—Plaintiff has still failed to show that she sustained repeated episodes of decompensation of an extended duration, other than the suicide attempt in August 2009, and perhaps another episode in 2013. She certainly has not shown that she averaged four episodes a year, nor that she was in a prolonged state of decompensation for any period of time at issue. In short, the ALJ did not err in finding that Plaintiff had not met the "paragraph B" requirement of episodes of decompensation.

Given that, the ALJ did not err in concluding that Plaintiff had not met all the "paragraph B" criteria, for a claimant must show that she meets at least two of the four functional domains, and the only domains Plaintiff claims to meet are episodes of decompensation and marked

---

[28]*See Pisciotta v. Astrue*, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) ("A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning such as inability to keep a job.").

limitations in concentration, persistence, or pace. Plaintiff having failed to show one of the two claimed requirements, it is clear the ALJ did not err in concluding that she had not shown she met all the "paragraph B" criteria.

Nonetheless, this Court considers and concludes that the ALJ did not err in also finding that Plaintiff had failed to show that she had marked limitations in concentration, persistence or pace. The ALJ relied upon the September 10, 2012 consultative examination by Dr. T.A. Moeller, Ph.D., who evaluated Plaintiff's attention and concentration with several tests that she performed well. Plaintiff was able to do serial 7s slowly, but correctly. She was able to remember her social security number and repeat it backwards. She was able to spell the word "world" but reversed two of the letters when spelling it backwards. Dr. Moeller noted that although Plaintiff claimed that her memory was impaired, his testing of mental status tasks did not support Plaintiff's allegation. Plaintiff was able to remember two of the four words given earlier in the evaluation and correctly identified the current and past three presidents. Dr. Moeller further noted, however, that Plaintiff's current memory functioning was lower than her cognitive abilities which appeared to be a function of Axis 1 pathology, that is Major Depressive Disorder, which Dr. Moeller found was not fully treated. Although Dr. Moeller noted that his testing also revealed that Plaintiff's WAIS-IV intelligence test composite scores were in the borderline or low average range, and her WMS-IV intelligence test scores were in the extremely low range, based on his testing of mental task function, he found at worst only moderate limitations in some categories of ability to understand, remember and carry out instructions in the workplace, and no marked or extreme limitations.

Plaintiff contends that the ALJ erred relying upon Dr. Moeller's opinion while rejecting

the March 16, 2012 opinion of treating APRN Koehn, who opined that Plaintiff had marked limitations in the ability to maintain attention and concentration for extended periods and the ability perform work duties at a constance pace without an unreasonable number and length of rest periods.  Generally, the ALJ is to assign and weigh every medical opinion in the claimant's case record.[29]  But only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment; and only acceptable medical sources can provide medical opinions and be considered treating sources.[30]  While licensed medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists and podiatrists and qualified speech-language pathologists are acceptable medical sources,[31] nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists and therapists are considered "other medical sources,"[32] who may not provide medical opinions, but may provide evidence to show the severity of a claimant's impairments and how it affects the claimant's ability to work.[33]  Because APRN Koehn is not a medically acceptable source, the ALJ did not err in not giving weight to her medical opinion about Plaintiff's impairments.

Moreover, the ALJ did consider the considerable evidence provided by APRN Koehn, who treated Plaintiff monthly for her psychological issues from 2010 through 2012, and whose colleague, APRN Tobe Schneider treated Plaintiff in 2013.  The ALJ's consideration of APRN

---

[29]20 CFR § 404.1527(b) and (c); 20 CFR § 416.927(b) and (c).

[30]*Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing SSR 06-03p, 20 C.F.R. § 04.1527(a)(2), and 20 C.F.R. §1527(d)).

[31]*Id.*

[32]*Id.*

[33]*Id.* (citing 20 C.F.R. § 404.1513(d)).

10

Koehn's longitudinal treatment records is evident, from his discussion of treatment records authored by Ms. Koehn,[34] and from his determination that Ms. Koehn's treatment records are internally inconsistent with her opinions about Plaintiff's limitations.[35]

This Court agrees that APRN Koehn's records are largely inconsistent with her opinion. During the three years that Plaintiff was treated by Ms. Koehn, treatment notes consistently stated that Plaintiff's memory was "intact."[36] Furthermore, during 2011 and 2012, Ms. Koehn and the other treatment providers at COMCARE consistently characterized Plaintiff's attention and concentration as "fair" or "intact," except for once noting in December 2009 that her attention and concentration were impaired.[37] In short, the ALJ properly considered the longitudinal treatment record, from 2010 through 2012, which consistently noted that Plaintiff's attention and concentration were fair or intact, and properly discredited Ms. Koehn's inconsistent opinion in March 2012 that Plaintiff had a marked limitation in attention and concentration. The ALJ properly gave weight to Dr. Moeller's examination and testing, and properly gave no weight to Ms. Koehn's opinion based not only on her not being an acceptable medical source but based on it being inconsistent with her treatment records. And, the ALJ properly found, consistent with Dr. Moeller's examination and the longitudinal record, that Plaintiff had no marked limitations in attention, concentration or pace.

---

[34]Tr. 75, 78-79, 81.

[35]Tr. 81-82.

[36]The Court notes that there was one notation in September 2013 that Plaintiff's memory was impaired. But this treatment occurred after the ALJ's decision in January 2013, and this note was not authored by APRN Koehn.

[37]The Court notes that *after* the ALJ's decision, beginning in December 2012 and continuing to 2013, treatment notes at COMCARE characterized Plaintiff's attention and concentration as impaired or poor.

11

Notably, the ALJ, based on medical and nonmedical evidence, determined that Plaintiff had moderate limitations, which informed the ALJ's RFC that Plaintiff had the ability to understand and remember only simple instructions, and maintain concentration, persistence and pace for only simple tasks in a work environment that limits her to only occasional contact with the general public, coworkers and supervisors, and that Plaintiff can adapt to changes in a work environment only within these same limitations.

Based on his proper finding that Plaintiff had moderate limitations in attention, concentration and pace, and no repeated episodes of decompensation of an extended duration, the ALJ properly concluded that Plaintiff did not meet the "paragraph B" criteria for Listings 12.04 and 12.08, and in effect found that she did not meet the same criteria for Listing 12.02. Moreover, given that Plaintiff did not and cannot meet this criteria for Listing 12.02, Plaintiff's arguments concerning the ALJ's misunderstanding of the effects of sleep apnea are inapposite. Also inapposite are Plaintiff's arguments that the ALJ did not understand the effect of bipolar disorder. Plaintiff simply did not meet her burden of showing that bipolar disorder was a medically determinable impairment, and notably did not challenge, much less meet her burden of showing, that the ALJ's step two determination of Plaintiff's medically severe impairments was erroneous because it did not include bipolar disorder.[38]

Because she must meet both "paragraph A" and "paragraph B" criteria for Listing 12.02, and because she fails to show substantial evidence that she satisfies two of the four domains of "paragraph B" upon which she relies, Plaintiff does not meet Listing 12.02. Thus, the ALJ's error in not applying Listing 12.02 is harmless error.

---

[38] *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (claimant bears the burden at step two of showing that she has a medically severe impairment or combination of impairments).

### B.   Weight accorded opinion of treating physician Dr. Ron Marek

The ALJ determined that Plaintiff's physical residual functional capacity (RFC) was that she could: perform light work; lift and carry, as well as push and pull, 20 pounds occasionally and 10 pounds frequently; stand, walk and sit about six hours in an eight-hour work day with normal breaks; occasionally climb stairs, ramps, ladders and scaffolds, balance, kneel, crouch and crawl; and avoid concentrated exposure to vibrations.

Plaintiff maintains that the ALJ erred in giving little weight to the opinion of her treating physician, Dr. Ron Marek, who treated her for fibromyalgia and lumbar pain for six months, from May 2010 to November 2010. While the ALJ acknowledged that he had considered Dr. Marek's opinion, he concluded that he was unable to afford the opinion controlling weight. The ALJ thus acknowledged the rule that the opinion of a treating physicians must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and is not inconsistent with other substantial evidence in the record, but if it is "deficient in either respect, it is not entitled to controlling weight."[39]

In fact, a treating physician's medical opinion is subject to a two-step inquiry. First, an ALJ must give such an opinion "controlling weight" if it is "'well-supported by medically acceptable clinical or laboratory diagnostic techniques'" and is not "'inconsistent with the other substantial evidence in the case record.'"[40] And, if a treating physician's medical opinion is not entitled to controlling weight, it is still entitled to deference; and at the second step of the

---

[39]*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2) and citing SSR 96- 2p, 1996 WL 374188, at *5 (July 2, 1996)).

[40]*Id.* (quoting SSR 96–2p, 1996 WL 374188, at *2); *see also* 20 C.F.R. § 416.927(d)(2) (listing same criteria).

analysis, the ALJ must make clear how much weight the opinion is being given, including whether it is being rejected outright, and "give good reasons, tied to the factors specified in the regulations. . . ."[41] Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[42] Further, if the ALJ does not give a treating physician's opinion controlling weight, he must consider *all* other medical opinions in the record to see if they outweigh the reports of the treating physician.[43]

Here, the ALJ found that Dr. Marek's November 9, 2010 opinion was not entitled to controlling weight because it was inconsistent with Dr. Marek's own treatment records. The ALJ noted that in September 2010, Dr. Marek performed a physical examination and noted that Plaintiff's pain was stabilized; and in June 2010 Dr. Marek noted that her condition was unremarkable with no edema noted. The ALJ further noted that in June 2010, Plaintiff reported to Dr. Marek that she was walking nine blocks in 25 minutes and in August 2010 she reported that she was swimming for exercise.

Plaintiff argues that the ALJ selectively considered the evidence. But the ALJ does not

---

[41] *Krause v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).

[42] *Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 290 (citing 20 CFR § 404.1527(d)(2)–(6))).

[43] SSR 96-5P, 1996 WL 374183 (July 2, 1996).

need to discuss all of the evidence; and in mentioning Dr. Marek's treatment notes in June, August and September 2010, the ALJ focused on the important trajectory of his treatment of Plaintiff. He first saw Plaintiff in May 2010, when she was complaining of "pain everywhere" that was not helped by her current medications. Thereafter, Dr. Marek prescribed Lortab and tried a number of other pain medications, including Lyrica, Savella and a Lidoderm patch. Given that Dr. Marek tried a number of pain medications, in a number of combinations, it is notable that the very next month, June 2010, Plaintiff reported being able to walk nine blocks and in August 2010 Plaintiff reported swimming for exercise. The Court further notes that in July 2010, Plaintiff reported that the Savella was helping her pain.

Yet, Plaintiff continued to experience some degree of pain. Dr. Marek noted that Plaintiff needed to have full functional capacity testing by a physical therapist. And, in November 2010, Dr. Marek recommended x-rays and imaging, which was not accomplished until December 2010. This is important, because neither these studies, nor any full functional capacity test results were available to Dr. Marek when he completed the Medical Source Opinion Questionnaire in November 2010. The ALJ properly discredited Dr. Marek's November 2010 opinion that Plaintiff could only sit or stand fifteen to twenty minutes at a time, and could sit, stand or walk for less than two hours in an eight-hour workday, with a need for frequent, unscheduled breaks, including the need for fifteen-minute walking breaks every fifteen to twenty minutes. Nothing in Dr. Marek's examination and treatment records was consistent with that opinion of Plaintiff's limitations. In fact, it is rather incongruous to opine that Plaintiff needs to walk every fifteen minutes for fifteen minutes, but can only walk, sit, or stand a total of two hours in an eight hour workday. This is internally inconsistent.

Moreover, the imaging studies that were done one month after Dr. Marek's opinion are medical evidence that is inconsistent with his opinion. The results of the radiographic imaging studies of Plaintiff's left knee and lumbar spine were: no signs of osteoarthritis; normal bony and joint structures of the left knee with no fluid or arthritis; and no fracture, dislocation or other bony abnormality in the lumbosacral spine. There was normal curvature and alignment and vertebral bodies and intervertebral spaces were well maintained.

To be sure, there are no laboratory tests for the presence or severity of fibromyalgia,[44] and a claimant's complaints of pain should not be discredited on the basis of the lack of clinical findings.[45] But the ALJ properly found that Dr. Marek's opinions were not supported by his own treatment records, for Dr. Marek recognized the need for imaging studies and full functional capacity testing, yet rendered an opinion unsupported by any studies, testing, or even contemporaneous treatment notes of his impressions that would support his opinion of her limitations in standing, walking, sitting, or climbing. There are no notations about her ambulation in the office, nor even any notations of Plaintiff's subjective complaints to him about her limitations in standing, walking, sitting or climbing, much less any of the other exertional limitations Dr. Marek opined about. Thus, the ALJ did not err in giving Dr. Marek's opinion little weight.

## V. Conclusion

For these reasons, the Court concludes that the ALJ did not err in finding that Plaintiff's

---

[44] *Moore v. Barnhart,*, 144 Fed. App'x. 983, 991 (10th Cir. 2004).

[45] *Id.* at 990-991.

sleep apnea did not meet Listing 3.09; and to the extent the ALJ erred in not evaluating Plaintiff's sleep apnea under Listing 12.02, that error was harmless in light of the ALJ's identical analysis under Listings 12.04 and 12.08 and his proper conclusion that Plaintiff failed to meet the "paragraph B" criteria.  Furthermore, the ALJ properly rejected the opinion of Plaintiff's treating physician Dr. Marek as unsupported by substantial evidence and inconsistent with Dr. Marek's own treatment records.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's decision denying Plaintiff disability benefits is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated: August 25, 2015 (11:03am)

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE